UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| FRED MILLER, | ) | CIVIL ACTION NO. 4:21-CV-986 |
| Plaintiff | ) | |
| | ) | |
| v. | ) | |
| | ) | (ARBUCKLE, M.J.) |
| GABRIEL CAMPANA, *et al.*, | ) | |
| Defendants | ) | |

## MEMORANDUM OPINION

## I.     INTRODUCTION

Fred Miller ("Plaintiff") is a lieutenant and has been employed by the Williamsport Police Department ("the Department") for over twenty years. In addition to working his way to the rank of lieutenant, Plaintiff is active in the local lodge of the Fraternal Order of Police. Plaintiff alleges he was, at times, subjected to anti-union animus, and in November 2018 filed a civil rights lawsuit against the City of Williamsport ("the City") in response. The lawsuit was settled out of court. Although Plaintiff aspired to become assistant police chief or captain, he has been bypassed for promotion multiple times. Plaintiff alleges that he was not promoted in retaliation for filing the civil rights lawsuit.

The parties in this case have consented to proceed before a United States Magistrate Judge. (Doc. 11).

Currently before the Court is Defendants' Motion for Summary Judgment. (Doc. 22). For the reasons explained in this opinion, Defendants' Motion will be denied.

## II.      BACKGROUND AND PROCEDURAL HISTORY

Before turning to the relevant legal standards, or the merits of the arguments raised in the Parties' Briefs, we will first set the scene with a discussion of the relevant facts and procedural history. In doing so, we will discuss Plaintiff and his history with the City, the process employed by two different Mayors to select the assistant police chief and captains, and the circumstances surrounding Plaintiff's pursuit of a promotion within the Department.

### A.      FRED MILLER: BACKGROUND AND LITIGATION HISTORY

On February 9, 1998, the City hired Plaintiff as a patrolman. (Doc. 24, ¶ 1); (Doc. 24, Ex. A 16: 17, 24); (Doc. 25, ¶ 1); (Doc. 25-1, 12:17, 24) (Doc. 25-2, p. 85).[1] In April 2010, Plaintiff was promoted to corporal. (Doc. 25, ¶ 82); (Doc. 25-1, 13:2-3) (Doc. 25-2, p. 84).[2] In November 2011, Plaintiff was promoted to patrol sergeant. (Doc. 25-2, p. 84). In August 2015, Plaintiff was promoted to agent. *Id*. In February of 2019, Plaintiff was promoted to lieutenant. (Doc. 24, ¶¶ 51-52); (Doc.

---

[1] The Court uses the pagination supplied by the ECF docketing system. Exhibit A of Document 24 is selected portions of the Deposition of Plaintiff on May, 24, 2022. Document 25-1 is the Deposition of Plaintiff on May 24, 2022.

[2] Document 25-2 is the Deposition of Derek Slaughter on September 7, 2022, including Deposition exhibits.

25, ¶¶ 51-52, 82); (Doc. 25-1, 14:16-17). A few months after he was promoted to lieutenant Plaintiff was asked to take a special assignment and became the 'administrative lieutenant.' (Doc. 25, ¶ 82); (Doc. 25-1, 14:19-22). As administrative lieutenant, Plaintiff performed the duties of a captain, supervising twenty individuals and "basically all police roles outside of the patrol division." (Doc. 25, ¶ 82). In approximately January of 2021 Plaintiff's special assignment terminated because a captain was promoted and Plaintiff went back to his last held rank, lieutenant on the night watch division, patrol division. (Doc. 25, ¶ 40); (Doc. 25-1, 81:19-82:2). Plaintiff is still employed with the City. (Doc. 24, Ex. A 16:18-20); (Doc. 25-1, 12:18-20). During his employment with the City, Plaintiff has been an active member and high-ranking representative of the Police Officers' Union, The Fraternal Order of Police, Lodge 29. (Doc. 1, ¶ 10).[3]

### 1.    Plaintiff's Litigation History Involving the City

Prior to this lawsuit, on November 6, 2018, Plaintiff filed a Civil Rights Complaint for First Amendment Retaliation based on his right of association against David Young, Jody Miller, Donald Mayes and the City of Williamsport, alleging retaliation against him for his associational activities as a union representative on

---

[3] The Fraternal Order of the Police, Lodge 29 is the recognized bargaining agent and representative for Police Officers below the rank of Captain employed by the City of Williamsport. (Doc. 1, ¶ 10).

behalf of the Police Officer's Union. (Doc. 1, ¶ 12).[4] During the pendency of *Miller I*, Plaintiff alleges Defendant former Mayor Campana ("Defendant Campana") asked to and met with Plaintiff, wanting to know if there was anything "we" could do regarding the lawsuit, with Defendant Campana apparently "want[ing] to make it go away." (Doc. 25, ¶ 11); (Doc. 25-1, 39:5-9).

On June 14, 2019, *Miller I* settled. (Doc. 24, ¶ 10); (Doc. 24, 100:1-2); (Doc. 25, ¶ 10); (Doc. 25-1, 101:1-2). On June 27, 2019, *Miller I* was dismissed by the parties pursuant to a stipulation. (Doc. 1, ¶ 14).[5]

### B.   POLICE COMMAND STRUCTURE AND SELECTION PROCESS FOR WILLIAMSPORT POLICE ASSISTANT CHIEF AND CAPTAIN

The Williamsport Police command structure is not static. During the period relevant to this action, the City had two mayors: Defendant Campana, and Defendant Slaughter. Defendant Campana held this office for twelve years, until early January 2020. (Doc. 24, ¶¶ 2-3); (Doc. 25, ¶¶ 2-3); (Doc. 25-2, 5:11-12); (Doc. 25-3, 6:2-4). Defendant Slaughter was sworn in as Mayor on January 6, 2020. (Doc. 25-2, 5:11-12). During both Defendant Campana's and Defendant Slaughter's tenures, the police command included at one time a police chief and assistant police chief with no captains, and at a different time a police chief and two captains with no assistant

---

[4] *See also*, Complaint, *Miller v. Young*, 4:18-CV-02148-MWB (M.D. Pa. Nov. 6, 2018), ECF No. 1 (hereinafter "*Miller I*").

[5] *See also* Stipulation, *Miller I*, ECF No. 23; and Order Dismissing Case, *Miller I*, ECF No. 26.

chief. (Doc. 24, ¶¶ 24, 26-28); (Doc. 25, ¶¶ 7, 24, 26-28); (Doc. 25-2, 21:9-22, 22:5-10); (Doc. 25-3, 7:10-15).[6]

The parties disagree with how the Williamsport assistant police chief and captains are to be appointed. Defendants assert the Mayor is responsible for appointing individuals to fill these positions. (Doc. 24, ¶ 4). Plaintiff asserts that it was the Mayor's duty to apply the civil service process as mandated under Pennsylvania state law in the Third Class City Code and Williamsport municipal ordinances to fill those positions. (Doc. 25, ¶ 4).

Regardless of whether proper, in this case Defendant Mayors Campana and Slaughter appointed the relevant assistant police chiefs and captains. (Doc. 24, ¶¶ 15, 17, 18, 24, 28, 72, 77); (Doc. 24, Ex. A 22:10-12, 36:3-4, 16-19; Ex. B 47:21-23; Ex. E 72:8-9, 76:19-21); (Doc. 25, ¶¶ 15, 17, 18, 24, 28, 72, 77); (Doc. 25-1, 23:25-24:2, 36:10-12; 115:3-4, 16-19); (Doc. 25-2, 19:5-8, 29:20-22); (Doc. 25-3, 21:19-22:3).[7] In making these appointments, Defendant Campana and Defendant Slaughter each employed a different selection process.

Defendant Campana did not have a formal application process and it is unclear if he hold formal interviews to select the candidates for assistant police chief. (Doc.

---

[6] Document 25-3 is the Deposition of Gabriel Campana on September 14, 2022.

[7] Exhibit B of Document 24 is portions of the Deposition of Gabriel Campana on May 25, 2022. Exhibit E of Document 24 is portions of the Deposition of Joelle Chappelle Gilbert on May 25, 2022.

24, ¶¶ 5, 6); (Doc. 25, ¶ 6); (Doc. 25-3, 17:19-25).[8]  In his depositions, Campana

indicated that he looked for loyalty, trustworthiness, competency, and compatibility

of style and temperament when making his decision. (Doc. 24, Ex. B 44:7-12); (Doc.

25-3, 14:18-21, 15:7).

Defendant Slaughter used a more formal application process, but chose not to

hold interviews. When two vacancies opened in the Department, Defendant

Slaughter posted the positions and solicited applications from internal candidates.

(Doc. 24, ¶¶ 56-60); (Doc. 25, ¶¶ 56, 58-59). The applications received were

circulated to a committee. (Doc. 24, ¶ 58); (Doc. 25, ¶ 58). Defendant Slaughter

discussed the candidates with the committee before announcing his decision. (Doc.

24, ¶ 64, 77); (Doc. 25, ¶¶ 64, 77).

### C.   FAILURE TO PROMOTE PLAINTIFF TO ASSISTANT POLICE CHIEF IN JANUARY 2019

In the fall of 2018, then police chief David Young announced his intention to

retire. (Doc. 1, ¶ 15). Defendant Campana was the Mayor at this time. Eventually

Damon Hagan ("Hagan") was promoted to police chief. (Doc. 25-4, 5:15-21).[9]

Hagan's promotion to police chief left the position of assistant chief open. It is

unclear what, if any, specific application process there was for the assistant chief

---

[8] Plaintiff alleges no formal interviews were held, (Doc. 25, ¶ 6), but Defendant Campana testified he interviewed Aaron Levan, (Doc. 25-3, 17:19-25).

[9] Document 25-4 is the Deposition of Damon Hagan on October 5, 2022.

position. Plaintiff "applied for" or "made known" his interest in filling the assistant chief position. (Doc. 24, ¶ 15); (Doc. 25, ¶ 15); (Doc. 25-1, 23:7-9).

Defendant Campana and Hagan discussed who Hagan would like to be his assistant police chief. (Doc. 24, 126:2-3); (Doc. 25-4, 8:2-3). Defendant Campana did not consider Plaintiff for the position of assistant chief. (Doc. 25, ¶ 15); (Doc. 25-3, 19:24-20:2).[10]   Plaintiff did not receive the assistant chief position, instead Aaron Levan ("Levan") was promoted to assistant chief. (Doc. 24, ¶ 15); (Doc. 25, ¶ 15). Levan had not sued the City. (Doc. 25, ¶ 16); (Doc. 26, p. 3). The parties do not dispute that Levan was qualified to be assistant chief. (Doc. 24, ¶ 16); (Doc. 25, ¶ 16). Plaintiff contends, however, that Levan was not more qualified than Plaintiff who had much longer tenure in the police department, had been a supervisor for much longer and had achieved higher rank than Levan. (Doc. 25, ¶ 16). Plaintiff

---

[10] During his deposition when asked Defendant Campana explained he did not consider Plaintiff because he "just didn't see it as a fit" and thought Plaintiff did not have the "fortitude in regards to being tough." (Doc. 25-3, 20:4-21:5). Plaintiff asserts that it was because of the lawsuits. (Doc. 25, ¶ 11). Plaintiff alleges:

> Defendant Campana told Marvin Miller that he would not hire Steven Helm as assistant chief for the sole reason that he had filed lawsuits against him and the City. (Ex. F, at 10:22-11:11). Campana refused to consider Plaintiff for the open position of assistant chief as well because of the lawsuits. (Ex. A, at 20:11-25, 37:13-16; Ex. C, at 18:20-19:2).

(Doc. 25, ¶ 11).

does not appear to bring a claim against any Defendant regarding this failure to promote.[11]

**D.   FAILURE TO PROMOTE PLAINTIFF TO ASSISTANT CHIEF IN SEPTEMBER 2019**

In September of 2019, Levan stepped down as assistant chief. (Doc. 1, ¶ 20). Defendant Campana was the Mayor at this time. It is again unclear what, if any, specific application process there was for the assistant chief position. Plaintiff "applied" again for the assistant chief position, communicating his interest in the job to the administration. (Doc. 24, ¶ 17); (Doc. 24, Ex. A 36:18-22); (Doc. 25, ¶ 17); (Doc. 25-1, 115:18-22). Then chief of police Hagan testified that while choosing a replacement for Levan, he recommended Plaintiff:

> Fred's name came up there for assistant chief prior to Mark's and Campana did not want him, I don't remember Gabe saying why . . . . Fred's name did come up, I did talk to Gabe about Fred . . . . I know Fred's name came up and Gabe didn't want him.

(Doc. 25-4, 54:8-55:2; *see also* 79:10-12). Hagan also testified that Campana's rejection of Plaintiff was "clear-cut." (Doc. 25-4, 80:22-81:3).

Plaintiff did not receive the assistant chief position, instead Mark Sechrist ("Sechrist") was promoted to assistant chief. (Doc. 24, ¶ 17); (Doc. 25, ¶ 17).

---

[11] In his complaint, under Count I, Plaintiff v. Defendant Gabriel Campana, Plaintiff writes, "50. Defendant Campana promoted Mark Sechrist, who had not filed previous lawsuits against the City, to the position of Assistant Chief." (Doc. 1, ¶ 50). Count II of Plaintiff's complaint is asserted against only Defendant Slaughter and Count III is asserted against only the City. (Doc. 1, pp. 8-10).

Sechrist had not sued the City. (Doc. 25, ¶ 17); (Doc. 26, p. 3). Plaintiff believed Sechrist was not qualified for the assistant chief position because he had never been a supervisor or held an administrative position. (Doc. 25, ¶ 19).

Plaintiff alleges he was not promoted because of *Miller I*. Defendants dispute this allegation.

### E.    FAILURE TO PROMOTE PLAINTIFF TO ASSISTANT CHIEF OR CAPTAIN IN OCTOBER 2020

When Sechrist announced his retirement, the City solicited applications for his replacement, as well as applications for a newly re-created captain of detectives position in September 2020.[12] (Doc. 26, p. 4). The job posting included both positions and instructed internal applicants to "submit a resume along with a letter of interest including the job or jobs you are seeking and how your skill and experience make you an excellent candidate." (Doc. 25-2, p. 80). The posting instructed interested applicants to email their resume and letter of interest to Joellen Chappelle Gilbert ("Gilbert"), the HR Director. *Id*. For both the assistant chief and captain positions, the job positing required candidates have "at least 10 years of service with the Bureau with at least one year as a supervisor or Agent." *Id*. Defendant Slaughter was the Mayor at this time.

---

[12] Plaintiff alleges that, as administrative lieutenant, he was already effectively performing the captain of detectives job. (Doc. 25, ¶ 24); (Doc. 25-1, 119:7-9); (Doc. 25-2, 34:5-8); (Doc. 25-4, 17:19-22).

All of six of the applicants were internal candidates: Plaintiff, Jody Miller, Marlin Smith, Jason Bolt ("Bolt"), Justin Snyder ("Snyder") and Steven Helm ("Helm"). (Doc. 24, ¶ 60); (Doc. 25, ¶¶ 24, 60); (Doc. 26, p. 4). Of these candidates, three had sued the City in the past (Plaintiff, Steven Helm and Jody Miller), and three had never sued the City (Marlin Smith, Jason Bolt and Justin Snyder). (Doc. 25, ¶¶ 24, 81).

Plaintiff submitted a two-page letter of interest, his resume, his training portfolio and a letter of reference from the District Attorney. (Doc. 25-2, pp. 81-88). At the time, Plaintiff had over twenty years of experience with the Department, including four years as an agent and one year as a Lieutenant. *Id.*

Justin Snyder submitted a one-page letter of interest. (Doc. 24, Ex. N p. 150);[13] (Doc. 25-2, p. 89). Snyder's letter of interest indicated that he had been with the Williamsport police since January of 2006 and currently held the position of Agent assigned to the Criminal Investigative Unit. *Id.* Snyder's letter of interest also indicated that his resume was attached, but no copy appears in the record. *Id.* If Snyder submitted additional application materials, they are not included in the summary judgment record.

---

[13] Exhibit N of Document 24 is portions of the Deposition of Justin Snyder on September 15, 2022 and Deposition exhibits.

Marlin Smith submitted a two-page letter of interest and sent an email to Joellen Chappelle Gilbert with the letter and his resume attached, however his resume is not included in the record. (Doc. 25-2, pp. 90-92). At the time, Marlin Smith had over five years of supervisory experience and was promoted to lieutenant in February 2019. *Id.*

Jason Bolt submitted his resume. (Doc. 24, Ex. I p. 111);[14] (Doc. 25-2, p. 93). If Bolt submitted additional application materials, they are not included in the summary judgment record. At the time, Bolt had sixteen years of experience in law enforcement and four years of experience as an agent. *Id.* He was promoted to lieutenant in 2020. *Id.*

The summary judgment record does not include Jody Miller or Steven Helm's application materials.

A committee was created to review the candidates and provide guidance to Defendant Slaughter. (Doc. 24, ¶¶ 58-59, 63-64); (Doc. 25, ¶¶ 58-59, 63-64). The members of that committee included: Joellen Chappelle Gilbert (the City's human resources director), Damon Hagan (police chief), Mark Sechrist (retiring assistant police chief), Janice Lee Holmes (Defendant Slaughter's executive assistant), and Defendant Slaughter. (Doc. 24, ¶ 63); (Doc. 25, ¶ 63).

---

[14] Exhibit I of Document 24 is the Deposition of Janis Holmes on September 14, 2022 and Deposition exhibits.

At least one committee meeting was held, during which the committee members discussed the candidates based on their written application materials and their personal familiarity with the applicants. After reviewing the applications, the two police officers (Hagan and Sechrist) recommended Plaintiff as captain of detectives and Helm for the position of assistant police chief. (Doc. 24, ¶ 66); (Doc. 25, ¶ 66); (Doc. 25-2, 26:6-8); (Doc. 25-4, 22:8-9, 63:20-22); (Doc 25-7, 11:18-20).[15] Neither candidate was selected for promotion.

Defendant Slaughter initially selected Marlin Smith for the position of assistant police chief, and Justin Snyder as the captain of detectives. (Doc. 24, ¶ 72); (Doc. 25, ¶ 24); (Doc. 25-2, 21:21-22:4); (Doc. 26, pp. 5-6). Shortly after Defendant Slaughter reached this decision, however, Marlin Smith withdrew his application. (Doc. 24, ¶ 72); (Doc. 25, ¶ 24); (Doc. 25-2, 21:21-22:4); (Doc. 26, p. 6).

Once Marlin Smith withdrew his name from consideration, Defendant Slaughter decided not to hire an assistant police chief at all. Instead, Defendant Slaughter decided to hire a second captain. (Doc. 24, ¶¶ 26, 28); (Doc. 24, Ex. C p. 54); (Doc. 25, ¶¶ 26, 28); (Doc. 25-2, 21:21-22:8); (Doc. 25-4, 41:6-19).[16] There is a dispute as to why this change was made. (Doc. 24, ¶ 27); (Doc. 25, ¶ 27). Jason Bolt was hired to fill the newly created captain of patrol position. (Doc. 24, ¶ 28);

---

[15] Document 25-7 is the Deposition of Mark Sechrist on October 5, 2022.

[16] Exhibit C of Document 24 is portions of the Deposition of Steven Helm on May 23, 2022.

(Doc. 25, ¶ 28); (Doc. 25-2, 22:5-8); (Doc. 25-4, 41:16-19). Plaintiff, Jody Miller, and Steven Helm (the three employees who sued the City in the past) were not selected for promotion.

Plaintiff alleges that he was not promoted because of *Miller I*. Defendants dispute this allegation.

## III.    LEGAL STANDARDS

Having reviewed the relevant factual background and procedural history, we now turn to the relevant legal standards. We will discuss the standards for resolving motions for summary judgment, and the elements Plaintiff must prove to prevail on a First Amendment Retaliation claim brought under 42 U.S.C. § 1983.

### A.    FEDERAL RULE OF CIVIL PROCEDURE 56: MOTIONS FOR SUMMARY JUDGMENT

Pursuant to Rule 56(a) of the Federal Rules of Civil Procedure, "[t]he court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."[17] A fact is material if proof of its existence or nonexistence might affect the outcome of the suit under the applicable substantive law.[18] For a dispute to be genuine, "all that is required is that sufficient evidence supporting the claimed factual dispute be

---

[17] Fed. R. Civ. P. 56(a).

[18] *Haybarger v. Laurence Cnty. Adult Prob. & Parole*, 667 F.3d 408, 412 (3d Cir. 2012) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)).

shown to require a jury or judge to resolve the parties' differing versions of the truth at trial."[19]

A party moving for summary judgment bears the initial burden "of informing the district court of the basis for its motion, and identifying those portions of [the record], which it believes demonstrate the absence of a genuine issue of material fact."[20] "If the burden of persuasion at trial would be on the non-moving party, the party moving for summary judgment may satisfy Rule 56's burden of production in either of two ways."[21] First, the party moving for summary judgment "may submit affirmative evidence that negates an essential element of the nonmoving party's claim."[22] Second, the party moving for summary judgment "may demonstrate to the Court that the nonmoving party's evidence is insufficient to establish an essential element of the nonmoving party's claim."[23]

Once the party moving for summary judgment has met its burden, "the non-moving party must rebut the motion with facts in the record and cannot rest solely

---

[19] *Id.* (quoting *Anderson,* 477 U.S. at 248-49).

[20] *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).

[21] *Id.* at 331 (Brennan, J., dissenting); *see also Finley v. Pennsylvania Dep't. of Corrs.*, 2015 WL 1967262, at *9 n.1 (M.D. Pa. Apr. 30, 2015) (observing that the Third Circuit has found that Justice Brennan's dissent in *Celotex* "does not differ with the opinion of the Court regarding the appropriate standards for summary judgment) (citing *In re Bressman*, 327 F.3d 229, 337 n.3 (3d Cir. 2003) and *Wisniewski v. Johns-Manville Corp.*, 812 F.2d 81, 84 n.2 (3d Cir. 1987)).

[22] *Celotex*, 477 U.S. at 331.

[23] *Id.*

on assertions made in the pleadings, legal memoranda, or oral argument."[24] To show that there is a genuine dispute of material fact, the non-moving party must cite to "particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits, declarations, stipulations (including those made for the purposes of the motion only), admissions, interrogatory answers, or other materials."[25] If the non-moving party "fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden at trial[,]" summary judgment is appropriate.[26] Summary judgment is also appropriate if the non-moving party provides merely colorable, conclusory, or speculative evidence.[27]

Finally, when ruling on a motion for summary judgment, it is not the province of the court to weigh evidence or assess credibility. It must view the evidence presented and draw all inferences in the light most favorable to the non-moving party.[28] The court may not decide whether the evidence unquestionably favors one side or the other or make credibility determinations.[29] Instead, it must decide whether

---

[24] *Berckeley Inv. Grp. Ltd. v. Colkitt*, 455 F.3d 195, 201 (3d Cir. 2006); *Celotex*, 477 U.S. at 324.

[25] Fed. R. Civ. P. 56(c)(1)(A).

[26] *Celotex*, 477 U.S. at 322.

[27] *Anderson*, 477 U.S. at 249.

[28] *Lawrence v. City of Phila., Pa.*, 527 F.3d 299, 310 (3d Cir. 2008) (citing *Davis v. Mountaire Farms Inc.*, 453 F.3d 554, 556 (3d Cir. 2006)).

[29] *Anderson*, 477 U.S. at 252.

a fair-minded jury could return a verdict for the non-movant on the evidence presented.[30] The Third Circuit has instructed that:

> To raise a genuine issue of material fact . . . the opponent need not match, item for item, each piece of evidence proffered by the movant. In practical terms, if the opponent has exceeded the "mere scintilla" threshold and has offered a genuine issue of material fact, then the court cannot credit the movant's version of events against the opponent, even if the quantity of the movant's evidence far outweighs that of its opponent. It thus remains the province of the fact finder to ascertain the believability and weight of the evidence.[31]

In contrast, "[w]here the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no genuine issue for trial."[32]

### B.  ELEMENTS OF A FIRST AMENDMENT RETALIATION CLAIM BROUGHT UNDER 42 U.S.C. § 1983

Plaintiff's First Amendment retaliation claim is brought under 42 U.S.C. § 1983. "Section 1983 imposes civil liability upon any person who, acting under the color of state law, deprives another individual of any rights, privileges, or immunities secured by the Constitution or laws of the United States."[33] "It is well settled that § 1983 does not confer any substantive rights, but merely 'provides a method for vindicating federal rights elsewhere conferred.'"[34] To establish a claim

---

[30] *Id.*

[31] *Big Apple BMW v. BMW of N. Am., Inc.*, 974 F.2d 1358, 1363 (3d Cir. 1992).

[32] *Matsushita Elec. Indus. Co. Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587.

[33] *Shuman v. Penn Manor Sch. Dist.*, 422 F.3d 141, 146 (3d Cir. 2005).

[34] *Williams v. Pa. Hum. Rels. Comm'n*, 870 F.3d 294, 297 (3d Cir. 2017) (quoting *Hildebrand v. Allegheny Cnty.*, 757 F.3d 99, 104 (3d Cir. 2014)).

under § 1983, Plaintiff must establish a deprivation of a federally protected right and that this deprivation was committed by a person acting under color of state law.[35]

In his complaint, Plaintiff alleges claims that his First Amendment rights were violated when two Mayors declined to promote him because he filed a prior lawsuit against the City. He also alleges that the City adopted a policy or custom of retaliating against employees who sued the City by refusing to promote them to the positions of assistant chief or captain.

To prevail on his retaliation claim against Defendants Campana and Slaughter at trial, Plaintiff must prove that: (1) he engaged in constitutionally protected conduct; (2) Defendants Campana and Slaughter engaged in "retaliatory action sufficient to deter a person of ordinary firmness from exercising his constitutional rights;" and (3) there is a causal link between the protected conduct and retaliatory action.[36] "If a plaintiff satisfies these elements, [Defendants] may avoid liability if [they] can show by a preponderance of the evidence that [they] would have taken the adverse action 'even in the absence of the protected conduct.'"[37]

---

[35] *Woloszyn v. Cnty. of Lawrence*, 396 F.3d 314, 319 (3d Cir. 2005).

[36] *Baloga v. Pittston Area Sch. Dist.*, 927 F.3d 742, 752 (3d Cir. 2019) (quoting *Thomas v. Indep. Twp.*, 463 F.3d 285, 296 (3d Cir. 2006)).

[37] *Id.* (quoting *Miller v. Clinton Cnty.*, 544 F.3d 542, 548 (3d Cir. 2008)).

A municipality, like the City, is not vicariously liable under § 1983 for the actions of its officials.[38] Municipalities can, however, be held liable "when execution of a government's policy or custom, whether made by its lawmakers or by those whose edicts or acts may fairly be said to represent official policy, inflicts the injury that the government as an entity is responsible for under § 1983."[39] "Policy is made when a 'decisionmaker possess[ing] final authority to establish a municipal policy with respect to the action' issues an official proclamation, policy, or edict."[40] Customs are "'practices of state officials . . . so permanent and well settled' as to virtually constitute law."[41] Thus, "[l]iability is imposed when the policy or custom itself violates the Constitution or when the policy or custom, while not unconstitutional itself, is the moving force behind the constitutional tort of one of its employees."[42]

---

[38] *Connick v. Thompson*, 563 U.S. 51, 60 (2011) (explaining that although municipalities can be liable as "persons" under § 1983, this liability extends only to its own illegal acts) (quoting *Pembauer v. Cincinnati*, 475 U.S. 469, 479 (1986)).

[39] *Monell v. N.Y.C. Dep't of Soc. Servs.*, 436 U.S. 658, 694 (1978).

[40] *Berg v. Cnty. of Allegheny*, 219 F.3d 261, 276 (3d Cir. 2000) (quoting *Kneipp v. Tedder*, 95 F.3d 1199, 1212 (3d Cir. 1996)).

[41] *Id.*

[42] *Thomas v. Cumberland Cnty.*, 749 F.3d 217, 222 (3d Cir. 2014) (quoting *Colburn v. Upper Darby Twp*, 946 F.2d 1017, 1027 (3d Cir. 1991)) (internal quotations omitted).

## IV.     DISCUSSION

Defendants set forth five arguments, in the following order, to support their motion for summary judgment:

(1)     Based on the undisputed material facts, no reasonable juror could conclude that Defendants' conduct deterred Plaintiff from exercising his First Amendment rights.

(2)     Based on the undisputed material facts, no reasonable juror could infer causation because there is not "unusual temporal proximity" between Plaintiff's prior lawsuits and the non-promotion, and there is no evidence Defendants engaged in a pattern of antagonism.

(3)     Plaintiff has no evidence that the City had a policy or custom of retaliating against employees who file lawsuits against it by refusing to promote them.

(4)     Based on the undisputed facts, Defendants Campana and Miller were not personally involved retaliating against Plaintiff for his past lawsuits.

(5)     Based on the undisputed facts, Defendants are entitled to summary judgment because Plaintiff did not suffer compensatory damages.

We will begin our analysis by addressing Defendants' fourth argument, then will address arguments one, two, three, and five.

### A.     A REASONABLE JURY COULD CONCLUDE DEFENDANTS' CAMPANA & SLAUGHTER WERE INVOLVED IN THE DECISION NOT TO PROMOTE PLAINTIFF

Defendants, relying on *Fiedler v. Stroudsburg Area Sch. Dist.*, 427 F.Supp.3d 539, 551 (M.D. Pa. 2019), argue that they are entitled to summary judgment because Plaintiff "has no evidence" that Defendants Campana or Slaughter "acquiesced or knew of actions by subordinates to infringe upon Plaintiff's first amendment rights."

(Doc. 23, pp. 14-15). Plaintiff's Complaint does not contain allegations necessary to support a supervisory liability claim against Defendants Campana or Slaughter, likely because he is not alleging a supervisory liability claim. There can be no dispute, however, that Plaintiff has alleged enough facts to support a claim of direct liability against Defendants Campana and Slaughter arising from their own conduct (as opposed to conduct by their subordinates). We also find that the summary judgment record contains enough evidence to create a triable issue of fact. The parties do not dispute that Defendant Campana made the decision not to promote Plaintiff in September 2019, (Doc. 24, ¶ 18); (Doc. 24, Ex. B 47:21-23); (Doc. 25, ¶ 18), and Defendant Slaughter made the decision not to promote Plaintiff in October 2020, (Doc. 24, ¶ 77); (Doc. 25, ¶ 77); (Doc. 25-3, 60:2).[43] This is sufficient to establish personal involvement for Plaintiff's § 1983 claim.

---

[43] Defendants argue that "[t]here is direct evidence, through Campana's promotion of Plaintiff to Lieutenant, that the original lawsuit did not deter Campana from appointing Plaintiff to a leadership position in the police department." (Doc. 23, p. 14). There is conflicting testimony, however, about whether or not it was the Mayor's decision to appoint lieutenants. Hagan testified that Campana "agreed" to promote Plaintiff to lieutenant. (Doc. 25-4, 10:12-14; *see also* 81:22-24). The Mayors testified differently. Defendant Campana testified:

A      Ultimately, my role was to hire and terminate --
Q      And was that at all --
A      -- command staff, non-unionized people.
Q      Okay. And what would be the non-unionized staff, what would those positions be if you could tell us from your recollections?
A      If you're talking about -- are we talking about the police department or just --
Q      The police department.

Accordingly, summary judgment will be denied on this basis.

**B.** **A Reasonable Jury Could Conclude that The Failure to Promote Employees Who File Civil Rights Lawsuits Against Their Employer Would Deter A Person of Reasonable Firmness from Filing Civil Rights Lawsuits**

In their first argument, Defendants contend that Plaintiff cannot prove Defendants' actions were sufficient to deter him from continuing to exercise his First Amendment rights. Essentially, Defendants argue there is no triable issue of fact because Plaintiff cannot satisfy the second element of his retaliation claims against Defendants Campana and Slaughter. In support of their position, Defendants argue:

> Subsequent to the filing of this action, Plaintiff commenced another lawsuit against the City of Williamsport and Slaughter based upon similar claims. *Fred Miller v. Derek Slaughter and City of Williamsport*, Lycoming County Court of Common Pleas, No. 22-CV-00308. Essentially, Plaintiff has demonstrated through his own actions

---

A    Okay. The police department would be the chief and the assistant chiefs or captains.

. . . .

Q    All right. Now, did you have any role with respect to promotions within the police department?

A    Promotions, only in regards to the chief and the assistant chief, but lieutenants, they took tests, and the other employees, they're unionized.

Q    Okay. And as I understand the unionized employees, is it fair to say that that was based upon testing and then provisions in the collective bargaining agreement that would effectively dictate who was next in line and that was what happened?

A    Yes.

(Doc. 25-3, 6:25-7:11; 8:18-9:3). When asked what his role as Mayor was regarding promoting someone to lieutenant, Defendant Slaughter testified that it would not be a decision he would make approving it, but a notification by the police chief. (Doc. 25-3, 10:13-16).

that the fact that he was not promoted has not had a deterrent effect. Plaintiff has continued to exercise his First Amendment Rights. Furthermore, Plaintiff's colleague, Steven Helm, filed a near-identical lawsuit to this one and Plaintiff's state court action subsequent to the commencement of this action. *Steven Helm v. Derek Slaughter and City of Williamsport*, Lycoming County Court of Common Pleas, No. 22-CV-00219. Although Plaintiff may argue that a person of ordinary firmness would be deterred, his conduct (and Mr. Helm's conduct) directly undermines any such an assertion.

(Doc. 23, pp. 7-8).

In response, Plaintiff argues that he is not required to prove that *he* was deterred from continuing to engage in protected conduct and that the failure to promote is a retaliatory act which would be sufficient to deter a person of ordinary firmness:

> However, for the second element, retaliatory conduct, courts focus on "whether the alleged retaliatory conduct was sufficient to deter a person of ordinary firmness from exercising his First Amendment rights." *Thomas v. Independence Twp.*, 463 F.3d 285, 296 (3rd Cir. 2006); *McKee v. Hart*, 436 F.3d 165, 170 (3rd Cir. 2006). "*This inquiry is an objective one and does not depend upon the actual effect of the retaliatory conduct on plaintiff.*" *Neuberger v. Gordon*, 567 F.Supp.2d 622, 637 (Del. 2008) (emphasis added). This is typically a question of fact. *Thomas*, 463 F.3d at 296. The actual effect of the retaliation on Plaintiff is immaterial.

> The failure to promote an employee is a retaliatory act which would be sufficient to deter a person of ordinary firmness. As Supreme Court has said, "Employees who find themselves in dead end positions due to their political background are adversely affected." *Rutan v. Republican Party*, 497 U.S. 62, 73 (1990), see also *Suppan v. Dadonna*, 203 F.3d 228, 233-235 (3rd Cir. 2002) (failure to promote claim constitutes retaliation). The refusals to promote to Assistant Chief and/or Captain are retaliatory acts sufficient to deter a person of ordinary firmness from exercising their Constitutional right.

(Doc. 26, pp. 8-9).

In response, Defendants reassert that "we know that the alleged actions did not deter an ordinary person from exercising his First Amendment rights because Miller has actually exercised his First Amendment rights but [sic] filing, yet another, lawsuit." (Doc. 27, p. 4).

Regarding the second element of Plaintiff's retaliation claims against Defendants Campana and Slaughter, the key inquiry is whether denying promotions to employees who have filed lawsuits against the City would sufficiently deter *a person of ordinary firmness* from exercising his or her constitutional rights. Therefore, it is not material that Plaintiff himself was not actually deterred.

Applying the correct standard, Defendants' argument is unavailing. Although the effect of an employer's retaliatory conduct must be more than *de minimis*, it need not be "great" to be actionable.[44] Plaintiff alleges that he was denied two promotions because he exercised his First Amendment rights. Defendants do not challenge Plaintiff's allegation that filing *Miller I* amounts to protected speech. Courts have found that a reasonable factfinder *could* conclude a person of ordinary firmness would be deterred from exercising their First Amendment rights where an employer retaliates by denying promotions, transfers, recalls after layoffs, or assigning low

---

[44] *Suppan v. Dadonna*, 203 F.3d 228, 235 (3d Cir. 2000) (quoting *Bart v. Telford*, 677 F.2d 622, 625 (7th Cir. 1982)).

rankings on a promotion list.[45] This case presents a similar scenario, and therefore we also conclude a reasonable factfinder could find that denying promotions to qualified individuals who exercised their rights in the past by filing civil rights lawsuits against their employer would deter a person of ordinary firmness from exercising their First Amendment rights.

Accordingly, summary judgment will be denied on this basis.

## C.   WHETHER THERE IS A TRIABLE ISSUE OF FACT AS TO CAUSATION

The third element of a First Amendment retaliation claim requires that Plaintiff show a causal link between the protected activity (filing *Miller I*) and the retaliatory action (declining to promote Plaintiff in September 2019 and October 2020). Plaintiff can establish the requisite causal connection by showing either: "(1) an unusually suggestive temporal proximity between the protected activity and the allegedly retaliatory action, or (2) a pattern of antagonism coupled with timing to establish a causal link."[46] The Third Circuit has "also observed that if such evidence

---

[45] *Rutan v. Republican Party*, 497 U.S. 62, 73 (rejecting the argument that denying a promotion would not deter a person of ordinary firmness and concluding that "[e]mployees who find themselves in dead-end positions due to their political backgrounds are adversely affected. They will feel a significant obligation to support political positions held by their superiors, and to refrain from acting on the political views they actually hold, in order to progress up the career ladder."); *Suppan*, 203 F.3d at 235 (finding a factfinder could determine that assigning police officers active in the local union artificially low rankings on a promotion list was sufficient to deter a person from ordinary firmness from exercising his First Amendment rights).

[46] *Baloga*, 927 F.3d at 759 (quoting *Lauren W. ex rel. Jean W. v. DeFlaminis*, 480 F.3d 259, 267 (3d Cir. 2007)).

is lacking, an employee may nevertheless prove causation 'from evidence gleaned from the record as a whole.'"[47]

> **1. There is a Genuine Issue of Material Fact as to Whether Plaintiff's Protected Conduct is Connected to Defendant Campana's Decision Not to Promote Plaintiff in October 2019**

As it pertains to Plaintiff's claim against Defendant Campana, the protected activity at issue is filing *Miller I*. *Miller I* was filed on November 6, 2018 and settled on June 14, 2019. Plaintiff alleges that he was not promoted to assistant police chief in September 2019 because he filed *Miller I*.

Defendants argue that no reasonable trier of fact could conclude that there is a causal connection between the October 2019 failure to promote and *Miller I*. They assert that: (1) there is not pattern of antagonism demonstrated in the records, (Doc. 23, p. 9); and (2) the temporal proximity between the litigation (which terminated in June 2019) and the failure to promote Plaintiff ten months after *Miller I* was filed and three months after settlement is not unusually close.[48] (Doc. 23, pp. 9-10).

In response, Plaintiff argues that evidence of causation can be circumstantial and a Plaintiff can "seek to prove causation by pointing to the record as a whole for

---

[47] *Id.* at 267 n.14 (quoting *Conard v. Pa. State Police*, 902 F.3d 178, 184 (3d Cir. 2018)).

[48] As to Defendants' argument that Plaintiff was promoted to lieutenant during this time, "negating any inference that he would not be promoted due to his lawsuit," the record reflects a dispute about Defendant Campana's involvement with that promotion. *See supra*, n.39.

evidence that suggests causation." (Doc. 26, pp. 9-10).[49] Plaintiff argues there is sufficient direct and indirect evidence of causation. (Doc. 26, pp. 10-12).

Defendants' reply argues that (1) Plaintiff has implicitly agreed there is no temporal proximity by claiming temporal proximity is not always necessary; (2) that Plaintiff simply argues he filed a lawsuit previously, and was subsequently not promoted and an individual who did not file a lawsuit was promoted but "has cited no authority supporting this bold conclusion;" and (3) that Plaintiff's opinion he was more qualified than others and some were not qualified, is opinion evidence that is not admissible and so cannot be considered in the context of summary judgment.[50] (Doc. 27, pp. 4-5).

We find that Plaintiff has produced sufficient evidence to demonstrate a genuine issue of material fact as to whether Defendant Campana's decision not to promote Plaintiff in September 2019 was related to his protected speech (*Miller I*). Plaintiff has provided some evidence that Defendant Campana was aware of the lawsuits and that he considered them as a factor when deciding who to promote in September 2019. Defendant Campana testified that he was aware Plaintiff had sued

---

[49] Quoting *Pribula v. Wyoming Area Sch. Dist.*, 599 F.Supp.2d 564, 573 (M.D. Pa. 2009).

[50] In support of this assertion Defendants cite to *Williams v. Borough of West Chester*, 891 F.2d 458, 466 (3d Cir. 1990) and include the parenthetical that the case "explain[s] that hearsay evidence produced in an affidavit opposing summary judgment can be considered, because it could later be presented at trial through direct testimony." (Doc. 27, pp. 4-5).

the City. (Doc. 25-3, 11:22-12:2). Plaintiff testified that during the pendency of *Miller I* Defendant Campana asked to and met with Plaintiff, wanting to know if there was anything "we" could do regarding the lawsuit, with Defendant Campana apparently "want[ing] to make it go away." (Doc. 25, ¶ 11); (Doc. 25-1, 39:5-9). Plaintiff made known that he was interested in the open assistant chief position in September 2019, (Doc. 24, ¶ 17); (Doc. 24, 36:18-22); (Doc. 25, ¶ 17); (Doc. 25-1, 115:18-22), but when asked if he considered Plaintiff for the job of assistant chief in September of 2019 at all, Defendant Campana testified that he did not. (Doc. 25-3, 32:2-4). Defendant Campana testified that in filling the assistant chief position he looked for "loyalty," someone he could "trust," and someone he would "feel comfortable around." Marvin Miller testified that when he recommended Steve Helm, who had also sued the City, for assistant chief to Defendant Campana, Campana replied that he could not promote Helm, because "[h]e's got the lawsuits." (Doc. 25-6, 9:1-2; 12:6-8).[51] (Doc. 24, Ex. B 44:7-12); (Doc. 25-3, 14:18-21, 15:7). A reasonable juror could infer the same logic would apply to Plaintiff given that he had also filed lawsuits. Plaintiff testified that he spoke with Adam Winder ("Winder"),[52] who told him that "they wouldn't touch [him] with a ten-foot pole due

---

[51] Document 25-6 is the Deposition of Marvin Daniel Miller on September 7, 2022.

[52] Defendant Campana testified that he thought he and Winder were "close friends" at the time, and that he felt he "could trust" because Winder was "loyal to the department," and who he would ask questions and what Winder "thought about

to the lawsuits that [he] had filed for an administrative position." (Doc. 25-1, 41:1-9). As to Defendants' argument that Plaintiff was promoted to lieutenant during this time, "negating any inference that he would not be promoted due to his lawsuit," the record reflects a dispute about Defendant Campana's involvement with that promotion.[53]

Thus, we find Plaintiff has produced enough evidence to allow a reasonable jury to conclude that Plaintiff's prior lawsuits were a substantial factor motivating Defendant Campana's decision not to promote Plaintiff in September 2019. Accordingly, summary judgment will be denied on this basis.

### 2. There is a Genuine Issue of Material Fact as to Whether Plaintiff's Protected Conduct is Connected to Defendant Slaughter's Decision Not to Promote Plaintiff in October 2020

As it pertains to Plaintiff's claim against Defendant Slaughter, Plaintiff's claim is based on the same protected conduct of filing *Miller I*. Plaintiff alleges that this protected activity substantially motivated Defendant Slaughter not to promote Plaintiff in October 2020 to assistant chief or captain.

---

certain things." (Doc. 25-3, 39:15-22; 40:1-3). Defendant Campana testified that he "hired [Winder] to be a truck driver and then [ ] hired him to be the assistant director of streets and parks, and then [ ] hired him to be the director of streets and parks. (Doc. 25-3, 36:19-22). In his deposition, Winder testified that when Defendant Slaughter became Mayor, Winder moved to work for River Valley Transit. (Doc. 24, Ex. G 93:20-22). Defendant Campana also testified that he did not believe he discussed the assistant chief position with Winder. (Doc. 25-3, 38:10-18).

[53] *See supra*, n.39.

Defendants argue that no reasonable trier of fact could conclude that there is a causal connection between the October 2020 failure to promote and *Miller I*. They assert that: (1) there is not pattern of antagonism demonstrated in the records, (Doc. 23, p. 9); and (2) the temporal proximity between the litigation (which terminated in June 2019) and the failure to promote Plaintiff more than a year later is not unusually close. (Doc. 23, pp. 9-10).

In response, Plaintiff argues that evidence of causation can be circumstantial and a Plaintiff can "seek to prove causation by pointing to the record as a whole for evidence that suggests causation." (Doc. 26, pp. 9-10).[54] Plaintiff argues there is sufficient direct and indirect evidence of causation. (Doc. 26, pp. 10-12).

Defendants' reply argues that (1) Plaintiff has implicitly agreed there is no temporal proximity by claiming temporal proximity is not always necessary; (2) that Plaintiff simply argues he filed a lawsuit previously, and was subsequently not promoted and an individual who did not file a lawsuit was promoted but "has cited no authority supporting this bold conclusion; and (3) that Plaintiff's opinion he was more qualified than others and some were not qualified, and Gilbert's "hunch" that Slaughter's decision had already been made before the meeting, is opinion evidence that is not admissible and so cannot be considered in the context of summary judgment. (Doc. 27, pp. 4-5).

---

[54] Quoting *Pribula*, 599 F.Supp.2d at 573.

More than one year passed between the date Plaintiff settled *Miller I* and the date Plaintiff was passed over for these promotions. (Doc. 24, ¶ 10); (Doc. 25, ¶ 10). We nonetheless find that Plaintiff has produced sufficient evidence to demonstrate a genuine issue of material fact as to whether Defendant Slaughter's decision not to promote Plaintiff in October 2020 was causally related to his protected speech (*Miller I*). First, Plaintiff has submitted evidence that shows both then police chief Hagan and then assistant police chief Sechrist recommended Plaintiff as their top choice for the captain of detectives position. (Doc. 25-2, 26:6-22; 42:10-15; 48:7-10; 59:4-5); (Doc. 25-4, 17:16-19; 22:8-9; 63:19-22); (Doc. 25-5, 15:16-17; 17:12-13); (Doc. 25-7, 11:18-20; 15:16). Second, Plaintiff has presented evidence showing that his prior lawsuits were discussed during the hiring process.[55] Third, Plaintiff has

---

[55] The following exchange occurred at Joellen Chappelle Gilbert's deposition:

Q     Okay. How about Janis Holmes, what was she saying with respect to the candidates?
A     Absolutely not for Fred and Steve.
Q     Okay. And did she say why?
A     Because they sued the city.

(Doc. 25-5, 17:16-20). Gilbert also testified "yes, absolutely, yes" when asked if Janice Holmes specifically mentioned the past lawsuits against the city. (Doc. 25-5, 18:2-5). Gilbert also testified:

Q     Now -- and you had indicated that Janis mentioned the lawsuits, correct, at this meeting. How long was she discussing that?
A     She discussed it quite openly and, you know, anybody that sued the city [sic] should not be in the administration, so --
Q     And what was the mayor's reaction to her comments along this line?
A     He never -- he did not say a word.

presented evidence that he was performing the function of captain of detectives without the title of captain at the time the decision was made to promote Snyder to that position and that Defendant Slaughter knew Plaintiff was and that "it was going okay." (Doc. 25-2, 33:19-34:16); (Doc. 25-4, 16:6-13); (Doc. 25-7:24:8-25:6). Fourth, Plaintiff has presented evidence that the litigation history of two other candidates (including Steven Helm) was discussed during the hiring process. (Doc. 25-5, 25:5-11); (Doc. 25-7, 11:6). Finally, Plaintiff has presented evidence that shows no candidate who sued the City in the past was promoted to assistant chief or captain by Defendant Slaughter.[56]

---

Q      He didn't say anything like that's wrong, we shouldn't do that or anything like that?

A      No. No.

(Doc. 25-5, 24:15-25:1).

The following exchange occurred at Mark Sechrist's deposition:

Q      All right. And so what was the tenor of that discussion?

A      Well, I believe Joellen -- Joellen Chappelle, the HR at that time, started off the meeting with saying that -- or at least at the very beginning of the meeting, said that Fred and -- Fred Miller and Steven Helm had filed lawsuits against the city [sic] and should we really consider them, something to the effect of . . . .

(Doc. 25-7, 10:25-11:8). Sechrist testified that it seemed to him that Defendant Slaughter "took into consideration everything that was said at the meeting . . . ." (Doc. 25-7, 12:16-17). Sechrist also testified that when Gilbert spoke about the lawsuits, he did not hear Defendant Slaughter speak up or say the lawsuits should not be considered. (Doc. 25-7, 14:22-15:3).

[56] After Marlin Smith withdrew, Defendant Slaughter had five candidates for two positions. The two candidates chosen were the only remaining candidates who had never initiated a lawsuit against the City. Further, Plaintiff has presented evidence that at the committee meeting, Defendant Slaughter said he was removing Jason Bolt's name from consideration because of lack of experience. (Doc. 25-7,

Therefore, we find Plaintiff has produced enough evidence to allow a reasonable jury to conclude that Plaintiff's prior lawsuits were a substantial factor motivating Defendant Slaughter's decision not to promote him in October 2020. Accordingly, summary judgment will be denied on this basis.

> **3.    Defendants Have Not Shown by a Preponderance of the Evidence They Would Not Have Promoted Plaintiff Even if He Had Not Filed *Miller I***

Defendants further argue that, even assuming Plaintiff could prove causation, they have sufficiently demonstrated they would not have promoted Plaintiff even if he had not filed *Miller I*.

> If a plaintiff demonstrates that the First Amendment protects his speech and that the protected speech was a substantial factor in the alleged retaliation, the burden shifts to the defendant to prove the same decision defense. *See Mount Healthy City Sch. Dist. Bd. of Educ. v. Doyle*, 429 U.S. 274, 285–86, 97 S.Ct. 568, 50 L.Ed.2d 471 (1977) ("The constitutional principle at stake is sufficiently vindicated if such an employee is placed in no worse a position than if he had not engaged in the conduct."); *see also Suppan v. Dadonna*, 203 F.3d 228, 236 (3d Cir. 2000) ("[T]he defendants, in proving 'same decision,' must prove that the protected conduct was *not* the but-for cause.") (emphasis in original). A defendant accomplishes this by "demonstrating by a preponderance of the evidence that the same action would have been taken even in the absence of protected conduct." *Watters v. City of Phila.*, 55 F.3d 886, 892 (3d Cir. 1995). "While but-for causation is the

---

16:17-23). However, after Marlin Smith withdrew and with Snyder being promoted to captain of detectives, Defendant Slaughter made the decision to go to two captains and no assistant chief, and then promoted Bolt, the only of the four remaining candidates who had not sued the City and whom Slaughter allegedly removed from consideration. (Doc. 24, ¶ 28); (Doc. 25, ¶ 28); (Doc. 25-2, 22:5-8); (Doc. 25-4, 41:16-19).

ultimate question, it is the defendants' burden to prove lack of but-for causation." *Suppan*, 203 F.3d at 236.[57]

Defendants assert that,

> Regardless of whatever remarks Campana made about Plaintiff's lawsuit, Campana also explained that he ultimately made the decision not to promote Plaintiff because he would not have an effective working relationship with him. This is certainly a justifiable reason for not promoting Plaintiff, given the amount of collaboration needed between two political positions – i.e., mayor and police chief. This is a perfectly valid reason for choosing another candidate with whom Campana felt he had a better working relationship.

(Doc. 23, p. 11). As to Defendant Slaughter, Defendants assert that,

> Ultimately, Slaughter decided that was not in favor of Plaintiff because he felt that Plaintiff was less qualified based upon education and experience than other candidates. In effect, he would have come to the same conclusion regardless of Plaintiff's protected actions because Plaintiff's protected actions did not factor into his decision.

(Doc. 23, p. 11). At this summary judgment stage, the Court must draw all inferences in the light most favorable to Plaintiff[58] and cannot make credibility determinations.[59]

Defendants appear to effectively ask the Court to credit their reasons for not promoting Plaintiff. Doing so would require the Court to inappropriately engage in weighing the evidence and credit Defendants' evidence over Plaintiff's. Regarding

---

[57] *McAndrew v. Bucks Cnty. Bd. of Comm'rs*, 183 F. Supp. 3d 713, 738-39 (E.D. Pa. 2016).

[58] *Lawrence*, 527 F.3d at 310 (citing *Davis*, 453 F.3d at 556).

[59] *Anderson*, 477 U.S. at 252.

Defendant Campana, Plaintiff has provided some evidence that Campana told two different individuals that the reason Helm could not be promoted was because of his previous lawsuits. (Doc. 25-6, 9:1-2; 12:6-8); (Doc. 25-1, 41:1-9); (Doc. 24, Ex. B 44:7-12); (Doc. 25-3, 14:18-21, 15:7). One could reasonably infer that the same logic would apply to Campana's decision not to promote Plaintiff or even consider him for the position. Regarding Defendant Slaughter, Plaintiff has provided evidence that *Miller I* was discussed at the committee meeting and that Defendant Slaughter did not speak up or say the lawsuits should not be considered. (Doc. 25-5, 24:15-25:1); (Doc. 25-7, 14:22-15:3). Further, Plaintiff has produced evidence that at the committee meeting Defendant Slaughter indicated he wanted to remove Bolt from consideration due to lack of experience, but then, when left with only four candidates to fill the captain of patrol position, Defendant Slaughter chose Bolt over the other three remaining candidates, all of whom had sued the City. (Doc. 24, ¶ 28); (Doc. 25, ¶ 28); (Doc. 25-2, 22:5-8); (Doc. 25-4, 41:16-19); (Doc. 25-7, 16:17-23). The offering of Defendants testimony that they decided not to promote Plaintiff for a different reason than the filing of *Miller I* is not enough to win at the summary judgment stage. The Court cannot simply disregard Plaintiff's proffer in favor of believing Defendants Campana and Slaughter's statements that they did not promote Plaintiff for reasons independent of *Miller I* and so would have made the same

decision regardless of the lawsuits. Accordingly, summary judgment will be denied on this basis.

**D.   DEFENDANTS DID NOT ADEQUATELY SUPPORT THEIR ARGUMENT THAT THERE IS NO EVIDENCE OF A CITY POLICY OR CUSTOM OF RETALIATING AGAINST EMPLOYEES WHO FILE LAWSUITS AGAINST THE CITY**

In his Complaint, Plaintiff alleges that the City is liable for the violation of his rights that occurred when he was denied a promotion. He identifies the following policy or custom to support that claim:

> 58. Defendants Derek Slaughter, Gabriel Campana, and City of Williamsport adopted a policy or custom wherein Defendant would retaliate against Officers for the previous filing of First Amendment Retaliation lawsuits against the City by refusing to promote them to the positions of Assistant Chief and/or Captain.

(Doc. 1, ¶ 58). As we understand it, Plaintiff alleges the existence of a "policy or custom" during Defendants Campana and Slaughter's tenure to retaliate against police officers for filing lawsuits against the City by denying them promotions to the positions of assistant chief and captain.[60]

---

[60] In response to Defendants' Motion for Summary Judgment, Plaintiff argues that summary judgment should be denied based on a different custom or policy than the one pleaded in his Complaint. Specifically, Plaintiff argues that "the custom or policy of the City of Williamsport was that the mayor decides unilaterally, in his sole discretion even when he retaliates against the exercise of First Amendment rights, who to promote to the positions of Assistant Chief and Captain and the process to fill those posts." (Doc. 26, pp. 12-13). Plaintiff is advised that he cannot amend his claims through arguments in a brief in opposition to a motion for summary judgment.

Defendants argue that Plaintiff has offered no evidence that Defendant Campana or Defendant Slaughter adopted such a policy, or established such a custom, of retaliating against police officers who sue the City. They do not cite, or even reference, any evidence from the record to support this argument. Thus, Defendants' assertion that there is "no evidence" cannot win the day. As explained in *Celotex*, when a moving party seeks summary judgment on the theory that the non-moving party (who will bear the burden of persuasion at trial) has no evidence:

> the mechanics of discharging Rule 56's burden of production are somewhat trickier. Plainly, a conclusory assertion that the nonmoving party has no evidence is insufficient. Such a "burden" of production is no burden at all and would simply permit summary judgment procedure to be converted into a tool for harassment. Rather, . . . a party who moves for summary judgment on the ground that the nonmoving party has no evidence must affirmatively show the absence of evidence in the record. This may require the moving party to depose the nonmoving party's witnesses or to establish the inadequacy of documentary evidence. If there is literally no evidence in the record, the moving party may demonstrate this by reviewing for the court the admissions, interrogatories, and other exchanges between the parties that are in the record. Either way, however, the moving party must affirmatively demonstrate that there is no evidence in the record to support a judgment for the nonmoving party.
>
> If the moving party has not fully discharged this initial burden of production, its motion for summary judgment must be denied, and the Court need not consider whether the moving party has met its ultimate burden of persuasion.[61]

---

[61] *Celotex*, 477 U.S. at 332 (Brennan, J., dissenting) (internal citations omitted).

Defendants have offered the Court nothing more than the bare assertion that there is no evidence. However, they have a burden here to "affirmatively show" why the evidence is inadequate to demonstrate the existence of the custom or policy alleged in Plaintiff's Complaint. They have not done so here. Accordingly, their request for summary judgment on this basis will be denied.

### E.   PLAINTIFF IS NOT REQUIRED TO PROVE COMPENSATORY DAMAGES TO WITHSTAND SUMMARY JUDGMENT

Defendants argue that, even assuming Plaintiff can prove liability, they are entitled to summary judgment because Plaintiff has not produced enough evidence to show he is entitled to compensatory damages. (Doc. 23, pp. 15-16). Plaintiff disagrees. Plaintiff argues that he has offered enough evidence to show he is entitled to compensatory damages, such as having to revert to the night shift and having to work overtime. (Doc. 26, p. 13). Plaintiff also argues that even if he has not "[i]f Defendants have nominal damages arguments, they can be presented to the jury." (Doc. 26, p. 14). In reply, Defendants argue that, regarding Plaintiff working the night shift, Plaintiff's "current position, duties and responsibilities are governed by the Collective Bargaining Agreement. Undoubtedly, Miller knows how to grieve an issue if he believes he is working a shift that he does not like." (Doc. 27, p. 5). Defendants further argue that the Collective Bargaining Agreement also dictates overtime and that Plaintiff gets paid for the overtime, where as the "politically

appointed positions" do not. (Doc. 27, p. 6). We are not persuaded by Defendants' arguments.

Plaintiff is not required to demonstrate compensatory damages as an element of a § 1983 claim to withstand summary judgment.[62] As explained in the commentary to the Third Circuit's Model Civil Jury Instructions for § 1983 claims:

> It is true that the plaintiff cannot recover compensatory damages without showing that the defendant's violation of the plaintiff's federal rights caused those damages. *See* Instruction 4.8.1, *infra*. It would be misleading, however, to consider this an element of the plaintiff's claim: If the plaintiff proves that the defendant, acting under color of state law, violated the plaintiff's federal right, then the plaintiff is entitled to an award of nominal damages even if the plaintiff cannot prove actual damages.[63]

Accordingly, summary judgment will not be granted on this basis.

## V.    CONCLUSION

Thus, for the foregoing reasons, Defendants' Motion for Summary Judgment (Doc. 22) will be DENIED. An appropriate order will be issued.


Date: April 18, 2024                                         BY THE COURT

                                                             *s/William I. Arbuckle*
                                                             William I. Arbuckle
                                                             U.S. Magistrate Judge

---

[62] *See Johnson v. Wild Acres Lakes Prop. & Homeowners Ass'n*, No. 3:07-CV-1384, 2009 WL 2426057, at *11 (M.D. Pa. Aug. 6, 2009); *L.T. Assoc. LLC v. Sussex Cnty. Council*, No. CV 11-774-MPT, 2013 WL 3998462, at *5 (D. Del. Aug. 5, 2013) ("[C]ompensatory damages are not an essential element of a § 1983 claim, because any form of damages, even nominal damages, will satisfy the element.").

[63] 3d Cir. Model Civil Jury Instructions § 4.3, Comment (2023).